Lena M. **STOGLIN**, Plaintiff,

v.

Kenneth S. **APFEL**, Commissioner of Social Security, Defendant.

No. 3–00–CV–90061.

United States District Court, S.D. Iowa, Davenport Division.

Dec. 19, 2000.

John A. Bowman, Davenport, IA, for plaintiff.

William C. Purdy, Asst. U.S. Attorney, Des Moines, IA, for defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Lena M. Stoglin, filed a Complaint in this Court on May 1, 2000, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

Plaintiff filed an application for benefits on March 26, 1997. Tr. at 82–84. After the application was denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Donald R. Holloway (ALJ) on September 14, 1998. Tr. at 34–62. The ALJ issued a Notice of Decision–Unfavorable on October 28, 1998. Tr. at 10–23. On March 3, 2000, the Appeals Council of the Social Security Administra-

tion affirmed the ALJ's decision. Tr. at 5–7. A Complaint was filed in this Court May 1, 2000. The Commissioner has moved for a remand and Plaintiff has resisted arguing that the evidence in the record supports a reversal with an award of benefits. The Court agrees with Plaintiff.

## MEDICAL EVIDENCE

On August 20, 1994, Plaintiff injured her back lifting a patient while working as a certified nurse's assistant. Early on, the injury was diagnosed as a lumbar and thoracic strain. Tr. at 195. Plaintiff continued working until August 8, 1996. Tr. at 82. On March 20, 1996, Robert W. Milas, M.D. stated that his impression was that Plaintiff has a ligamentous injury of the lumbar spine. Tr. at 207.

On June 24, 1996, Richard L. Kreiter, M.D., an orthopedic surgeon (Tr. at 264), wrote that Plaintiff returned to his clinic after an absence since November of 1994, at which time the diagnosis was mechanical back discomfort without radiculopathy. Dr. Kreiter noted that prolonged walking or standing at work, or forward flexion lifting, was painful for Plaintiff. X-rays of the lumbosacral spine that day revealed significant narrowing of the L5 S1 disk space with some small anterior osteophytes. Tr. at 229. Plaintiff obtained a new back brace, but on July 12, 1996, she reported that making beds and pushing wheelchairs at work was aggravating her back pain. Dr. Kreiter noted that Plaintiff was unable to use anti-inflammatory medication because of peptic ulcer problems. Dr. Kreiter also opined that Plaintiff might be a candidate for "some secretarial type activity." Tr. at 228. On September 6, 1996, Plaintiff told Dr. Kreiter that she was unable to walk very far because of her back pain. The Doctor noted "a lot of spasm." Tr. at 227. On December 9, 1996, Dr. Kreiter wrote that Plaintiff "has a degenerative L5 S1 disc which is aggravated by lifting or twisting at the lumbar

area, forward flexion and at times prolonged standing." Tr. at 223. Dr. Kreiter's office note of January 1, 1997, states that while she was in a grocery store the previous week, Plaintiff bent over and fell resulting in increased pain. Tr. at 226. Dr. Kreiter filled out an Attending Physician form on which he opined that Plaintiff's physical impairment was between Class 4—meaning capable of sedentary or clerical work occasionally lifting 10 pounds—and Class 5—meaning incapable of minimal activity[1]. Tr. at 231.

On January 17, 1997, Plaintiff saw Timothy J. Miller, M.D., a physician at Genesis Medical Center—Pain Management Center, because of her back pain. "She describes constant back pain and also has had increase in weight, very poor exercise tolerance." On examination, Plaintiff had very poor flexion and extension and significant pain on the left side only over the facet joints at L4–5 and L5–S1. Plaintiff was offered injections as a possible precursor to facet denervation if she were helped a great deal. Plaintiff elected to undergo the injection. Tr. at 239. On February 3, 1997, Plaintiff reported that she had wonderful pain relief for about a week after the injection. She underwent radiofrequency denervation on the left at L3–4 and L4–5. Tr. at 237. Plaintiff returned to Dr. Miller on March 10, 1997 complaining of numbness developing on the entire left side of her body from her face all the way down to her toes. Dr. Miller arranged to have Plaintiff seen by a neurologist. Tr. at 236.

Plaintiff saw Stephen C. Rasmus, M.D., a neurologist (Tr. at 265), on April 7, 1997. Tr. at 232–33. Dr. Rasmus noted that Plaintiff has a history of hypertension which is not well controlled with the diastolic pressure in the 100 to 110 range. Plaintiff told the doctor that she has excessive daytime sleepiness and that her family had noticed snoring as well as at least one episode of apnea. Tr. at 232. After his

---

1. The ALJ read Dr. Kreiter's opinion to mean that on some days Plaintiff would be capable of sedentary work, while on other days she would not be. Tr. at 56.

examination Dr. Rasmus diagnosed left sided numbness of uncertain etiology, but most consistent with a pure sensory stroke. "She is at risk of pure sensory stroke, lacunar type, with her hypertension." Further, the doctor opined that Plaintiff's history was also very good for obstructive sleep apnea which may be an explanation for why her hypertension has been difficult to control and which adds a risk factor for stroke. Tr. at 233.

Plaintiff saw Paul R. Hartmann, M.D., a family practice specialist (Tr. at 266), for a physical examination at the request of Disability Determination Services on October 1, 1997. Tr. at 249–52. Plaintiff told Dr. Hartmann that her feet go numb after sitting. "She states she has difficulty sitting for more than 15 minutes, after 20–30 minutes must get up to move around. She has difficulty lifting. She thinks she can stand for 1–2 hours total. She states she can walk about two blocks. If she runs up steps she gets palpitations and throat fullness." Plaintiff also reported depression to Dr. Hartmann. Tr. at 249. On physical examination, Plaintiff's blood pressure was 160/110. A repeat blood pressure reading was 176/110. Dr. Hartmann found Plaintiff's "range of motion of the lumbar spine" to be normal, as was straight leg raising. Dr. Hartmann opined that the x-rays of the lumbar and thoracic spine showed no significant degenerative changes: "She had mild Schmorl's defect and very minimal anterior lipping at one level, but the intervertebral disc spaces appeared well maintained, as did the facet joints." The doctor's assessment was that Plaintiff has lumbago with no significant neurological findings. Dr. Hartmann stated that he did not have any records from Dr. Kreiter. Dr. Hartmann concluded his report:

I believe her remaining physical capacities fall in the moderate range, and that she could lift and carry 30 lbs. frequently for short distances. She could stand, move about and walk for 1–2 hours up to 3 times daily during an 8 hour day. She reports discomfort with sitting, and may need the opportunity to get up and move around after 30 minutes before sitting

again. I believe she could occasionally stoop, climb, kneel and possibly also crawl. She has no apparent deficits handling objects, seeing, hearing nor speaking.

Tr. at 250.

Plaintiff returned to Dr. Miller on December 23, 1997 because of persistent low back pain. Dr. Miller wrote: "At this point, I would feel there is a fairly high likelihood of disk-mediated pain." Dr. Miller prescribed Ultram for pain control. Tr. at 267.

On June 29, 1998, Plaintiff saw Dr. Kreiter, who stated that Plaintiff was having "muscle spasm back pain without sciatica." Tr. at 268.

Plaintiff underwent a vocational evaluation from September 8 to 12, 1997. Tr. at 153–64. Although it was determined that Plaintiff was able to do the lifting of sedentary work (a maximum of 10 pounds) and of light work (maximum of 20 pounds; 10 pounds often), it was also noted that Plaintiff "should avoid prolonged sitting, standing, or walking." Tr. at 155. When Plaintiff's ability to work in a seated position was measured it was observed that: "Her sitting tolerance was no less than 6–7 minutes, and no greater than 40 to 45 minutes. Lena sits about 18 to 22 minutes—'on average'—before she feels the need to stand to alleviate discomfort." The Valpar Simulated Assembly Work Sample was administered to test Plaintiff's tolerance for repetitive assembly tasks and to give "evidence of the evaluee's ability to stand in one place for a significant amount of time." Plaintiff was tested for sixty minutes and her scores were measured in twenty minute intervals. Tr. at 158. Plaintiff developed low back pain after the first interval during which she stood. She was only able to stand for four to five minutes of the second interval and she needed to sit six to seven minutes of the third. After the hour of testing was over, Plaintiff "walked with a noticeable limp." Tr. at 159.

## ADMINISTRATIVE HEARING

Plaintiff appeared with counsel and testified at a hearing on September 14, 1998. Tr. at 34–62. At the time of the hearing Plaintiff was 50 years old. Tr. at 38. Plaintiff testified that she continued to work for a year after she hurt her back. Tr. at 40. Her alleged onset of disability date is August 8, 1996. Tr. at 37. Plaintiff testified that she is unable to lift anything over 50 pounds. Tr. at 42. When asked how long she can sit or stand, Plaintiff responded:

I try to make myself stand alone until I can barely, until I can't bare the pain, then I'll sit down for maybe about a half an hour, then I will get up and I'll get up and I'll do something else. I mean this is all going on all day, so, I'm not really, I don't really set myself at a time because I try to make myself do a lot and keep myself from getting still. And I get up and I sit down and I get up and I sit down, this is all day.... And then if I go to the store, that's (inaudible) around in the country in the store and like the pressure from my heels, the pain goes up my back then I have to stop and rest in the store and sometimes the people think I'm crazy, but I have to stop ... and just hold onto the buggy, you know and sit there for a little while, but other than that I just keep going, I make my self go.

Tr. at 43. Plaintiff said that her legs, primarily the left leg, retain fluid and she needs to keep her left leg elevated when she sits. Tr. at 44. She also said that the medication she takes for the fluid retention makes her go to the bathroom frequently, as often as every fifteen to twenty minutes. Tr. at 45.

After Plaintiff testified, the ALJ called Carma Mitchell to testify as a vocational expert. Tr. at 50. The ALJ asked the following hypothetical question:

Let's take a hypothetical woman and put the limitations that Dr. Hartmann talks about and so let's say she could lift about 50 pounds occasionally and 25 pounds frequently and she could carry for short distances, but her step there would need to do some alternating sitting and standing, she could stand, be on her feet for an hour or a bit more, up to three times a day. She could sit for a half hour at a time and then in order to resume sitting would have to be free to stand and move about some, rather than just return to sitting. She could only occasionally stoop, kneel, crawl or climb and, and only occasionally crawl too. Let's say those were the only limitations our hypothetical person had, could that person be expected to perform her past relevant work?

Tr. at 53–54. In response, the vocational expert testified that Plaintiff would not be able to do her past work, but that she would retain skills from her nurse's aide work that would transfer to jobs such as blind aid and companion. The vocational expert said that if Plaintiff needed to prop one leg up, she could still work as a blind aide. Tr. at 54. The vocational expert also said that if Plaintiff needed to use the bathroom at the frequency to which she testified, she would not be able to work because "... although there is flexibility there are certain tasks that need to be completed ..." Tr. at 55. The ALJ asked the vocational expert to assume that Plaintiff would not be able to work consistently and would not be able to comply with the sitting and standing limitations of the first hypothetical. In response, the vocational expert said that there would be no work Plaintiff would be able to do. Tr. at 58.

## ALJ'S AND APPEALS COUNCIL'S DECISIONS

The ALJ issued a Notice of Decision— Unfavorable on October 28, 1998. Tr. at 10–23. Following the familiar five step sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 8, 1998. At the second step, the ALJ found that Plaintiff "has severe disorders of the back, an impairment which is severe." The ALJ found that the severe impairment does not meet or equal an impairment listed in Ap-

pendix 1, Subpart P, Regulations No. 4. Tr. at 21. At the forth step of the sequential evaluation, the ALJ found that Plaintiff is unable to return to her past relevant work.

At the fifth step of the sequential evaluation, the ALJ found that Plaintiff has the residual functional capacity to lift 50 pounds occasionally and 25 pounds frequently. The ALJ found that Plaintiff can carry weight for only short distances; stand one hour at a time for up to three times a day; sit 30 minutes at a time after which she must be able to stand and move about before sitting again, and that Plaintiff must be able to elevate her leg when sitting. The ALJ found that Plaintiff can occasionally stoop, crawl, kneel, and climb. The ALJ found that Plaintiff acquired no transferable work skills from her past work.[2] The ALJ found that Plaintiff is able to do the jobs listed by the vocational expert at the hearing and is, therefore, not disabled. Tr. at 22.

The ALJ's decision was affirmed by the appeals council on March 3, 2000.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contra-

dictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan*, 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel*, 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

In the case at bar, after Plaintiff filed her brief the Commissioner moved for a remand. Subsequently, Plaintiff resisted the Commissioner's motion urging the Court to reverse and award benefits.

■ The ALJ found that Plaintiff is unable to do her past relevant work. The burden of proof, therefore, was on the Commissioner to prove, with medical evidence, that she has a residual functional capacity and that other jobs exist that she is capable of performing. *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir.2000) citing *McCoy v. Schweiker*, 683 F.2d 1138, 1146–47 (8th Cir.1982)(en banc), and *O'Leary v. Schweiker*, 710 F.2d 1334, 1338 (8th Cir. 1983). *See also Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir.2000), citing *Nevland.*

■ One searches in vain for any medical evidence to support a finding that Plaintiff is able to lift 50 pounds, even on an occasional basis. The only piece of evidence that remotely supports the finding is Plaintiff's testimony that she can lift no more than 50 pounds. Plaintiff's testimony, however, is inconsistent with the medical opinion in the record. There is not one piece of medical or vocational evidence which corroborates Plaintiff's testimony on that point. While Plaintiff may, wanting to put the best face on her condition, believe that she can lift up to 50

---

**2.** See also the transcript at page 20 where the ALJ wrote: "According to the testimony given by the vocational expert, the claimant has a semi-skilled work 'background. There is no evidence that she has acquired any transferable work skills."

pounds, residual functional capacity is a medical question, and there is no medical evidence to support her statement. *See Ford v. Secretary of Health And Human Services,* 662 F.Supp. 954, 955 (W.D.Ark. 1987) (residual functional capacity is a medical question). Even if Plaintiff is to be believed that she can sometimes lift fifty pounds, a credibility finding is not equivalent to proving with medical evidence that a claimant has a residual functional capacity for work. *Soth v. Shalala,* 827 F.Supp. 1415, 1417 (S.D.Iowa 1993).

■ The ALJ stated, both at the hearing and in his decision, that he relied on the opinion of Dr. Hartmann to support his finding that Plaintiff can frequently lift and carry thirty pounds. In the opinion of the Court reliance on Dr. Hartmann was misplaced for a number of reasons. In the first place, Dr. Hartmann saw Plaintiff on only one occasion. It is well settled law that the opinion of a physician who examines a claimant once does not constitute substantial evidence to support a denial of benefits. *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir.1998). On the other hand, a treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical or diagnostic data. *Id.* citing *Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996). Likewise, the Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. *Id.* citing *Metz v. Shalala,* 49 F.3d 374, 377 (8th Cir.1995). Dr. Kreiter who opined that Plaintiff's residual functional capacity was somewhere between sedentary and none at all, is a treating orthopaedic surgeon, while Dr. Hartmann's speciality is family practice. Tr. at 266. It was error for the ALJ to disregard Dr. Kreiter's opinion, which is supported by his clinical observations over an extended period of time, in favor of a physician who examined Plaintiff once and who did not have the benefit of all of Plaintiff's medical records. Dr. Kreiter's opinion that Plaintiff is limited to seden-

tary or less work was expressed not only in the insurance form, but also in office notes, (see, e.g., the note of December 6, 1996 at page 227 of the record), and in a letter to an attorney in a Worker's Compensation case (see letter of December 9, 1996 at page 223 of the record).

■ In the opinion of the Court, the ALJ failed to take into account the effects of Plaintiff's chronic hypertension and resulting kidney disease which, according to Dr. Hartmann "is probably responsible for her shortness of breath and also her activity limitations." Also, the chronic hypertension, according to Dr. Rasmus, puts Plaintiff at risk of a pure sensory stroke, lacunar type. Dr. Rasmus wrote that the etiology of the numbness Plaintiff experiences on her left side is "most consistent with a pure sensory stroke." There is no indication in the record that Dr. Hartmann was privy to Dr. Rasmus' report just as he was deprived of Dr. Kreiter's records.

A lacunar stroke is a type of ischemic stroke. Pierre B. Fayad & Lawrence M. Brass, *Stroke: identifying acute cerebral infarction,* 31:1 Consultant 23 (January, 1991). Lacunar, or small vessel, infarctions occur after occlusion of the small penetrating arteries. *Id.* The walls of these vessels undergo a degeneration known as lipohyalinosis, which is usually associated with hypertension and diabetes. *Id.* The infarcts appear as small, punched-out, round lesions (usually less than 1 cm). *Id.* "Although the loss of neural tissue is small, *it can occur at key areas and lead to profound clinical deficits."* (Emphasis added) *Id.* Among the four common lacunar stroke syndromes is pure sensory (thalamus) stroke. *Id.* There is no evidence in the record to support a finding that Plaintiff recovered from the numbness on the left side of her body. It is unfortunate that neither Plaintiff's counsel nor the ALJ developed the record on the severity and duration of this impairment. With a little research and correspondence with Dr. Rasmus, Plaintiff's counsel could have been prepared to inform the ALJ about

this uncommon, at least in the experience of the Court, disease. Although the ultimate responsibility to fully and fairly develop the record rests with the ALJ even if the claimant is represented by counsel, it would seem to the Court that claimants seek out experienced Social Security lawyers so that issues that may otherwise escape notice can be brought to the attention of the ALJ so that benefits can be awarded in the shortest amount of time. *See Battles v. Shalala,* 36 F.3d 43, 44 (8th Cir.1994) holding that the goals of the Commissioner and advocates are the same i.e. that deserving claimants who apply for benefits receive justice.

Other evidence which detracts from the ALJ's finding that Plaintiff has the residual functional capacity to work is the report of the vocational rehabilitation evaluation which demonstrated that Plaintiff needs to alternate between sitting and standing on a frequent basis. The Commissioner published Social Security Ruling 83–12 (SSR 83–12) to discuss, among other things, the situation of an individual who must alternate periods of sitting and standing. The ruling explains that professional or managerial jobs allow a person to sit or stand with a degree of choice. Unskilled jobs, on the other hand, "are particularly structured so that a person cannot ordinarily sit or stand at will." SSR 83–12 states:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks,

lunch periods, etc., would still be able to perform a defined range of work.)

In *Carter v. Sullivan,* 909 F.2d 1201, 1202 (8th Cir.1990), the Court, citing 20 C.F.R. § 404.408, stated that Social Security Rulings are binding on all components of the Administration. The Court also held that an agency's failure to follow its own binding regulations is a reversible abuse of discretion.

In the case at bar, the ALJ found that Plaintiff does not have transferable skills. This was stated explicitly both in the findings section of the decision, and in the body of the decision. It was inappropriate, therefore, for the ALJ to find that Plaintiff is able to do the two semi-skilled jobs identified by the vocational expert at the hearing. Because Plaintiff is limited to unskilled work, given the binding instructions in SSR 83–12, and given the evidence in the record regarding Plaintiff's inability to stand long enough to do the requisite activity of light work, and the inability to sit long enough to do sedentary work, the ALJ should have found Plaintiff disabled.

Because Plaintiff is unable to do either light or sedentary work, a remand to take additional evidence, as urged by the Commissioner, would serve no useful purpose other than to delay the receipt of benefits to which she is entitled. The Commissioner's Motion To Remand, therefore, is hereby denied.

### CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). The Court finds no substantial evidence, medical or otherwise, to support a finding that Plaintiff has a residual functional capacity to engage in competitive work. A vocational expert

testified that if Plaintiff is unable to consistently perform the sitting and standing requirements of work, no work is possible. This testimony is consistent with SSR 83–12. A finding of disability, therefore, is appropriate. A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

Defendant's motion to remand for additional proceedings denied. **This cause is remanded to the Commissioner for the sole purpose of computation and payment of benefits.** The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer*, 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999), and LR 54.2(b).

IT IS SO ORDERED.